**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Dale Burns and Shirleen Hoffman,

Plaintiffs,

v.

City of Minneapolis, Minnesota; Robert Olson, individually, and in his official capacity as Police Chief of the City of Minneapolis; William Jones, individually; and Sally Beel, individually,

Defendants.

**MEMORANDUM OPINION AND ORDER**
Civil No. 00-577 ADM/AJB

---

Pamela Marie Miller, Esq., and William J. Mavity, Esq., Mavity & Associates, Minneapolis, Minnesota, appeared for and on behalf of the Plaintiffs.

Caroline M. Bachun, Esq., Assistant City Attorney, Minneapolis, Minnesota, appeared for and on behalf of the Defendants.

---

## I. INTRODUCTION

On September 20, 2001, the undersigned United States District Judge heard Defendants' Motion for Summary Judgment [Doc. No. 45]. Defendants seek summary judgment on Plaintiffs Dale Burns' ("Burns") and Shirleen Hoffman's ("Hoffman") claims of (1) defamation; (2) tortuous interference with contracts; (3) negligent infliction of emotional distress; (4) conspiracy to deprive equal protection; (5) violation of equal protection; and (6) violation of the Minnesota Government Data Practices Act. For the reasons articulated below, the Defendants' Motion is granted.

DEC 11 2001
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD.
DEPUTY CLERK

## II. BACKGROUND[1]

This case arises out of an internal affairs investigation into the police department's horse-mounted patrol unit and subsequent disciplinary action taken against Burns and Hoffman. During the relevant time period, the City of Minneapolis, Minnesota ("the City") employed Robert Olson ("Olson") as Chief of Police. William Jones ("Jones") was the Deputy Chief of the police department. Sally Beel was an internal affairs investigator with the rank of Sergeant within the police department.

The City's police department has employed Burns since April, 1987. He holds the rank of Sergeant. Hoffman began working for the City's police department in April, 1976. She was the first female officer promoted to Sergeant in 1986. The department promoted her to Lieutenant in 1990.

Based upon Hoffman's initiative and proposal, the City police department created a mounted patrol unit in 1994. Hoffman became the Lieutenant in charge of the mounted patrol. Burns was a Sergeant in charge of the mounted patrol. Hoffman and her staff were responsible for conducting inventory of the mounted patrol's equipment, some of which turned up missing. Because it was not fully funded, Hoffman raised money for the mounted patrol through a nonprofit organization, Friends of the Minneapolis Mounted Patrol,[2] by selling T-shirts and hats with the mounted patrol insignia. *See* Hoffman Dep., at 170. Hoffman failed to keep an

---

[1] As required in the summary judgment context, the facts are reviewed in the light most favorable to Plaintiffs.

[2] Friends of the Minneapolis Mounted Patrol is a nonprofit organization, created by the Downtown Council, that raises funds for stabling, equipment, and all other costs related to horses for the patrol, except the salaries of its officers. *See* Mavity Aff., Ex. K.

accounting of the sales of the T-shirts and hats. *Id.* at 172. She allowed officers to sell and give away T-shirts, but she did not record who took the shirts to sell or give away, or how many were actually given away. *Id.* at 173-74.

In August, 1997, the City police department commenced an internal affairs investigation concerning allegations of improper conduct within the mounted patrol unit. Beel and Sergeant Kimberly Coughlin (f/k/a Johnson) led the investigation into the allegations relating to Hoffman and Burns. *See* BS # 3308. The investigation discovered that Hoffman had received a $600 check payable to her personally for the sale of a mounted patrol horse. *See* BS ## 3398-99. Hoffman deposited the check dated March 14, 1996, into her personal checking account. *See* Hoffman Dep., at 97-98. On November 21, 1997, investigators questioned Hoffman about the proceeds from the sale of the mounted patrol horse that were deposited into her own account. *See* BS # 3404. Initially, Hoffman could not explain what she did with the proceeds, but later stated that she paid back the $600 as part of the $800 check she wrote payable to the Friends of the Minneapolis Mounted Patrol on April 19, 1997. *See* BS # 3403. The note on the envelope containing the $800 check did not mention[3] that $600 of the total was the proceeds from the sale of a patrol horse. *See* Andren Aff. ¶¶ 1, 2 & 5. Vicki Andren does not recall Hoffman informing her that $600 of the $800 check accounted for proceeds from the sale of the horse. *Id.* ¶ 5.

The internal affairs investigation probed allegations that Burns was not at work when scheduled and was working an off-duty job while being paid for working by the City. Burns later

---

[3] The notation reads: "Vicki Andren, There are still a few T-shirts & hats out there but this is about the last of the money from me. I heard the Beer tasting was a huge success. 10,000 tickets at $4 each – Great! How were the T-shirt sales? I'm working on a new budget & updated inventory – Shirleen." Andren Aff. ¶¶ 1, 2 & 5.

admitted to working on outside employment a few times while on the City's time clock. Hoffman was unaware Burns was working on outside employment while on duty. *See* Hoffman Dep., at 163.

On or about December 5, 1997, Chief Olson met with media reporters to discuss the internal affairs investigation of the Minneapolis mounted patrol unit and inform the media that the Bureau of Criminal Apprehension ("BCA") was beginning a criminal investigation into the matter. *See* Mavity Aff., Exs. J, K. Based upon the type of evidence discovered during the internal affairs investigation, Olson had referred it to the BCA on December 2, 1997. *See* Olson Aff. ¶ 7, Ex. 3.

On February 19, 1998, a disciplinary panel held hearings concerning Burns and Hoffman. *See* Jones Aff. ¶ 3. The disciplinary panel consisted of Jones, Deputy Chief Hestness, and Deputy Chief Schultz. Id. ¶ 4. Sergeant Kroll, a union representative, argued that there was bias in the investigation and that evidence had been unfairly excluded. On February 26, 1998, Jones wrote a letter to Olson, communicating the panel's recommendation that Hoffman be terminated. *See* Mavity Aff., Ex. F. Jones wrote:

> Lt. Hoffman's continuing management incompetence alone would require demotion, but coupled with theft and lying, she can no longer effectively function as a police officer. For that reason the panel recommends that Lt. Hoffman be terminated from employment with the city.

*Id.* Based upon the panel's recommendation, Olson fired Hoffman on March 3, 1998. A newspaper article[4] reported Hoffman's termination. *See* Mavity Aff., Ex. K.

---

[4] Chris Graves, *Minneapolis Lieutenant Fired after Horse Patrol Inquiry*, Star Tribune, March 3, 1998, at 1.

Jones communicated the disciplinary panel's recommendation that Burns be permanently demoted on March 3, 1998. *See id.*, Ex. Y. Jones wrote:

> Sgt. Burns' misconduct in this case was most serious and ongoing. "Double-dipping," or getting paid from two jobs at the same time constitutes a serious infraction if done on one occasion, but Burns did this on many occasions . . . . For misconduct of such a serious nature, the panel feels that the appropriate discipline for Sgt. Burns is a permanent demotion to police officer and prohibition from working off-duty employment for one year.

*Id.* Olson adopted the panel's recommendation.

Both Burns and Hoffman filed grievances appealing their discipline. Burns admitted to minor infractions, agreed to the suspension period, and settled his grievance. On June 3, 1998, he was reinstated to the rank of Sergeant. Burns continues to work for the City police department.

Hoffman's grievance was arbitrated. The arbitrator issued a decision on December 14, 1998. *See* Mavity Aff., Ex. L. The arbitrator found insufficient evidence to support the allegations of theft and lying to investigators. *Id.* Based on the arbitration result, the City reinstated Hoffman to her rank of Lieutenant, with full back pay and benefits. *See* Hoffman Dep., at 180. Thereafter, Hoffman worked in the domestic assault unit and she retired in April, 2000. *Id.* at 59, 67.

## III. DISCUSSION

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Matsushita Elec.*

*Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The movant has the burden of showing that no genuine issue of material fact exists. *See Celotex*, 477 U.S. at 323. Once the movant meets its burden, the party opposing the motion may not rest upon mere allegations or denials, but "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The mere existence of a "scintilla of evidence" in support of the non-movant's position is insufficient; there must be evidence on which a jury could reasonably find for the non-movant. *Anderson*, 477 U.S. at 252. The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.

**A. Defamation**

Plaintiffs Burns and Hoffman allege that Defendants defamed them by wrongfully accusing them of serious acts of dereliction. To be considered defamatory, a statement of fact about a plaintiff must be communicated to someone other than the plaintiff, it must be false, and it must tend to harm the plaintiff's reputation and to lower him or her in the estimation of the community. *See Lewis v. Equitable Life Assurance Soc'y*, 389 N.W.2d 876, 886 (Minn. 1986). Under Minnesota law, a statement can have: (1) a clear defamatory meaning on its face; (2) no possible defamatory meaning at all; or (3) ambiguity rendering it reasonably susceptible to a defamatory meaning as well as an innocent one. *See Toney v. WCCO Television*, 85 F.3d 383, 386 (8th Cir. 1996); *Church of Scientology v. Minnesota State Medical Ass'n Found.*, 264 N.W.2d 152, 155 (Minn. 1978). When a statement falls into category three, whether or not "a defamatory meaning is conveyed is dependent upon how ordinary men understand the language in light of the surrounding circumstances." *Gadach v. Benton County Co-op Ass'n*, 53 N.W.2d

230, 231 (Minn. 1952) (citations omitted). A court must not conclusively interpret a category three statement, but should decide whether the statement conceivably could be interpreted as defamatory. *See Toney*, 85 F.3d at 386.

To establish a claim for defamation, "the specific words complained of must be set forth, as well as who made the statement, to whom it was made, and where." *Lilligren v. Midwest Comm., Inc.*, Case No. 4-88-881, 1989 WL 165241, at *4 (D. Minn., Oct. 25, 1989); *see also Moreno v. Crookston Times Printing Co.*, 610 N.W.2d 321, 326 (Minn. 2000) (requiring defamatory matter to be "set out verbatim" in the complaint). Plaintiffs' vague allegations that false statements, accusations, and rumors about them were circulated around town are insufficient to state a claim for defamation. To the extent Plaintiffs rely on such chatter, summary judgment is granted on their defamation claim.

More specifically, Plaintiffs point to three allegedly defamatory statements requiring further analysis: (1) a December 5, 1997 newspaper article containing statements attributable to Olson; (2) statements Beel made in her investigative report; and (3) statements Jones made in his letters to Olson recommending demotion for Burns and termination for Hoffman. *See* Mem. in Opp'n., at 15-16. None of these statements contain a clear defamatory meaning. Furthermore, a careful scrutiny of the statements reveals that they are incapable of being reasonably interpreted as defamatory.

Hoffman claims she was defamed by Olson's reports to the media. The December 5,

1997, newspaper article[5] discussed the internal investigation of the finances of the Minneapolis police horse patrol. *See* Mavity Aff., Ex. K. The newspaper reported allegations of improprieties in the handling of money contributions to the nonprofit organization supporting the police horse patrol. *Id.* The article named Hoffman and Burns as those "responsible for managing the horse patrol's finances." *Id.* The article quoted Olson as saying, "[a]s we were getting towards the end of this internal investigation . . . we became concerned in a couple of areas where the accountability for some money [was] not satisfactory. This [had] to do with fund-raising and receiving donations, that kind of thing." *Id.* The newspaper reported that "Olson [did not] know if any of the managers [would] be disciplined." *Id.*

Defamatory meaning attributable to Defendants cannot be found on the face of this article. Nor can defamatory meaning be drawn from Olson's remarks by implication. That Hoffman brought this action against Defendants, not the newspaper, distinguishes this situation from cases in which the media's juxtaposition of facts resulted in defamation by implication. *See, e.g.*, *Toney*, 85 F.3d at 387. A newspaper decides what information to print and how to arrange the facts. Defendants did not have control over the media's report regarding this matter of public concern. Hoffman has failed to meet her burden of identifying a specific, published statement by Olson that is capable of being reasonably construed as defamatory.

Additionally, Defendants argue that Olson, as Chief of Police, is shielded by a privilege. Absolute privileges protect a publisher of statements against liability for defamation regardless of

---

[5] Joy Powell, *Investigation Finds Problem in Police Horse Patrol Unit*, Star Tribune, December 5, 1997, at 1.

motive and cannot be defeated by any showing of malice. *See Moreno*, 610 N.W.2d at 328 (citations omitted). An absolute privilege applies to protect the public service or the administration of justice.[6] *Id.* (citing cases). Because Olson does not occupy a high-level, cabinet-equivalent position in state government, the absolute privilege is inapplicable here. *See Johnson v. Dirkswager*, 315 N.W.2d 215, 220 (Minn. 1982) (holding that the absolute privilege "protects the superior officers of the state governments, including at least the governor, the attorney-general or the heads of state departments whose rank is the equivalent of cabinet rank in the Federal Government.").

Qualified privileges attach to a broader range of circumstances where the interest in shielding the defendant is considered less compelling, but still worthy of some protection. *Moreno*, 610 N.W.2d at 328 (citations omitted). A qualified privilege protects a publication "when it was made by a person in the discharge of a public or private duty, legal or moral, or in the conduct of his own affairs and in matters where his interest is concerned." *Id.* A statement enjoys a qualified privileged "if made upon proper occasion, from a proper motive, and based upon reasonable or probable cause." *Bauer v. State of Minnesota*, 511 N.W.2d 447, 449 (Minn. 1994) (citing *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 256-57 (Minn. 1980)). However, a showing of common law malice, ill will, or improper motive may defeat a qualified privilege. *Moreno*, 610 N.W.2d at 328 (citations omitted). Olson's statements are protected by a qualified privilege. *See Carradine v. State of Minnesota*, 511 N.W.2d 733, 737 (Minn. 1994)

---

[6] It is noteworthy that Minnesota affords immunity from criminal liability for defamation if the "communication consists of a fair and true report or a fair summary of any judicial, legislative or other public or official proceeding . . . ." Minn. Stat. § 609.765, subd. 3(4) (1998).

(holding that police officer receives qualified immunity for statements made in response to media inquiries). Hoffman has not presented sufficient evidence that any of Olson's statements arose from ill will, improper motives, or a reckless desire to injure her.

Next, Plaintiffs claim defamation arising from Beel's statements in her investigative report. Communications regarding such investigations of employee misconduct are qualifiedly privileged. *See McBride v. Sears, Roebuck & Co.*, 235 N.W.2d 371, 374 (Minn. 1975). This privilege is based upon the employer's "important interest in protecting itself and the public against dishonest or otherwise harmful employees." *Id.* Here, the public has a legitimate concern about possible misappropriations of money from the horse patrol. Accordingly, Defendants are entitled to a qualified privilege for the statements relating to the police department's internal affairs investigation. Those communications were made on a proper occasion, with a proper motive, and were based upon probable cause. Plaintiffs have failed to set forth sufficient evidence creating a genuine issue as to whether any statements were made from "ill will and improper motives, or causelessly and wantonly for the purpose of injuring [them]." *Stuempges,* 297 N.W.2d at 257 (quotation omitted).

Finally, Plaintiffs aver that Jones' statements in his letters to Olson recommending demotion for Burns and termination for Hoffman defamed them. As chair of the disciplinary panel, Jones communicated the findings of the investigations into employee malfeasance and explained the justifications for the disciplinary recommendations. *See* Mavity Aff., Exs. F, Y. Accordingly, a qualified privilege protects these statements. *See McBride*, 235 N.W.2d at 374. The burden is on Plaintiffs to show that the privilege has been abused. *See Stuempges,* 297

N.W.2d at 257. Plaintiffs failed to present evidence sufficient to create a genuine issue of material fact on this issue. As Defendants' counsel admitted during oral argument, the investigation's conclusion may have been incompetent or misguided, but it was not the product of ill will or improper motives.

Similar to the plaintiff in *Johnson v. Dirkswager*, Burns and Hoffman eventually were reinstated to their positions with back pay. That is their proper redress. Their right to recover something more in the form of defamation damages is sacrificed at the altar of a democratic society, the fundamental values of which necessitate disclosure of the performance of the public business by public officials. *See Johnson*, 315 N.W.2d at 223; *see also infra*, § F.

**B. Tortuous interference with contract**

To state a claim for tortious interference with contractual relations, Plaintiffs Burns and Hoffman must show that "(1) a contract existed; (2) the alleged wrongdoer had knowledge of the contract; (3) the alleged wrongdoer intentionally interfered with the contract; (4) the alleged wrongdoer's actions were not justified; and (5) damages were sustained as a result." *Guiness Import Co. v. Mark VII Distribut., Inc.*, 153 F.3d 607, 613 (8th Cir. 1998) (citing *Sip-Top, Inc. v. Ekco Group, Inc.*, 86 F.3d 827, 832 (8th Cir. 1996) (applying Minnesota law)); *Kjesbo v. Ricks*, 517 N.W.2d 585, 588 (Minn. 1994). Plaintiffs' claim fails because Defendants did not wrongfully and intentionally interfere with the terms of Plaintiffs' union contract. The union contract did not specify procedures for internal affairs investigations. The actions taken by Olson, Jones, and Beel were justified as they were acting within the scope of their duties in the investigation. *See Nordling v. Northern States Power Co.*, 478 N.W.2d 498, 507 (Minn. 1991)

("employee is privileged to interfere with or cause a breach of another employee's employment contract with the company, if that person acts in good faith, whether competently or not, believing that his actions are in furtherance of the company's business."). The union contract was followed. After their discipline, Burns and Hoffman appealed through union grievance procedures and were reinstated. Furthermore, because Burns agreed to his suspension and Hoffman received full back pay, Plaintiffs have sustained no compensable damages. Summary judgment is granted.

**C. Negligent infliction of emotional distress**

To establish a claim for negligent infliction of emotional distress, Plaintiffs Burns and Hoffman must show they (1) were within a zone of danger of physical impact; (2) reasonably feared for their own safety; and (3) suffered severe emotional distress with attendant physical manifestations. *K.A.C. v. Benson*, 527 N.W.2d 553, 557 (Minn. 1995). Plaintiffs do not allege they were in a zone of danger of physical impact. However, Minnesota recognizes an exception to the "zone of danger" requirement where a plaintiff has suffered mental anguish resulting from a direct invasion of rights, such as when one is defamed. *Wallin v. Minnesota Dept. of Corrections*, 598 N.W.2d 393, 406 (Minn. App. 1999). Plaintiffs are unable to establish a negligent infliction of emotional distress claim because their defamation claims have been dismissed by grant of summary judgment. Moreover, Plaintiffs provide insufficient evidence to support their conclusory allegations of severe emotional distress with attendant physical manifestations. *See Anderson*, 477 U.S. at 249 ("there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party").

No genuine issue of material fact exists regarding Plaintiffs' claim of negligent infliction of emotional distress. Summary judgment is granted.

**D. Conspiracy**

To establish a claim under 42 U.S.C. § 1985(3), Hoffman must demonstrate (1) that Defendants conspired, (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or equal privileges and immunities under the laws, (3) that one or more of the conspirators did, or caused to be done, any act in furtherance of the object of the conspiracy, and (4) that another person was injured in his person or property or deprived of having and exercising any right or privilege of a citizen of the United States. *Larson v. Miller*, 76 F.3d 1446, 1454 (8th Cir. 1996). The "purpose" element requires proof of a class-based invidiously discriminatory animus. *City of Omaha Employees Betterment Ass'n v. City of Omaha*, 883 F.2d 650, 651 (8th Cir. 1989) (citations omitted). Additionally, Hoffman "must allege with particularity and specifically demonstrate with material facts that the defendants reached an agreement." *Id.* Hoffman may satisfy this burden by pointing to at least some evidence suggesting that Defendants reached an understanding to violate her rights. *Id.* However, Hoffman may not rest on "mere allegations," she must demonstrate the existence of specific facts that create a genuine issue for trial. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 249. This she has failed to do. Summary judgment is granted.

**E. Equal Protection**

The Equal Protection Clause of the Fourteenth Amendment requires the government to treat similarly-situated individuals alike. *See City of Cleburne v. Cleburne Living Ctr., Inc.*, 473

U.S. 432, 439 (1985). Hoffman claims that Defendants deprived her of her right to equal protection of the laws based upon her gender. To state an equal protection claim, Hoffman must show that (1) she was singled out and treated differently than others similarly situated, and (2) the government action was based upon her gender. *See Ellbracht v. Police Bd. of Metro. Police Dept. of City of St. Louis*, 137 F.3d 563, 566 (8th Cir. 1998). Hoffman has the burden of proving that the employees with whom she wishes to be compared were similarly situated to Hoffman in all relevant respects. *See Britton v. City of Poplar Bluff*, 244 F.3d 994, 998 (8th Cir. 2001).

Hoffman argues that she is similarly situated to male individuals, including Lieutenant Michael Fossum and Officer James Carlson, who were found to have lied to internal affairs investigators and were not fired. Fossum was disciplined for misrepresentations regarding an e-mail he sent referring to Chief Olson as a "weasel." Carlson was disciplined for lying about photographing a semi-nude "DejaVu" dancer while she was sitting in a police squad car. By contrast, the conduct and issues underlying the investigators' questions to Hoffman were of a different character entirely, her misleading behavior was attendant to separate potentially criminal offenses. She is not similarly situated. The disciplinary panel found Hoffman lied when she stated that officers had not reported missing equipment and possible theft to her. *See* Mavity Aff., Ex. F. Hoffman also was charged with depositing the $600 into her own account and failing to properly supervise Burns. Because Hoffman was accused of more serious offenses than either Fossum or Carlson, they cannot be considered similarly situated to her in all relevant respects.

Furthermore, Hoffman has presented no specific facts indicating Defendants' actions

were based on her gender. Nor has evidence been produced that the City has a policy or practice of discriminating on the basis of sex. Hoffman has failed to produce evidence sufficient to raise a genuine issue of material fact regarding her equal protection claim. Summary judgment is granted.

**F. Minnesota Government Data Practices Act**

The Minnesota Government Data Practices Act ("MGDPA") provides a regulatory framework for the collection, creation, storage, maintenance, dissemination and access to the government data maintained by state agencies and political subdivisions. *See* Minn. Stat. §§ 13.01- .99. The MGDPA establishes a presumption that all government data are public and are accessible to the public. *Id.* § 13.01, subd. 3. Specific personnel data[7] of public employees are public data, including, *inter alia*, matters such as name, salary, job title, job description, education and training background, date of first and last employment, and work location. *See id.* § 13.01, subd. 2(1)-(8). "All other personnel data is private data on individuals." *Id.* § 13.43, subd. 4.

The MGDPA also classifies as public "the existence and status of any complaints or charges against the employee, regardless of whether the complaint or charge resulted in a disciplinary action." *Id.* § 13.43, subd. 2(a)(4). However, the "specific reasons" and "data documenting the basis" for an existing complaint or charge are nonpublic until there has been a "final disposition of any disciplinary action." *Id.* § 13.43, subd. 2(a)(5). A "final disposition"

---

[7] "Personnel data" is defined as "data on an individual collected because the individual is or was an employee of . . . a political subdivision . . ." Minn. Stat. § 13.43, subd. 1.

results when a state agency "makes its final decision about the disciplinary action, regardless of the possibility of any later proceedings or court proceedings." *Id.* § 13.43, subd. 2(b). Where a public employee's collective-bargaining agreement provides for grievance arbitration, a "final disposition" does not occur until the conclusion of the arbitration proceeding. *See id.*; *Unke v. Independent Sch. Dis. No. 147*, 510 N.W.2d 271, 273 (Minn. App. 1994).

Hoffman argues that the City disseminated her private personnel information to the media in violation of the MGDPA. There is insufficient evidence of any such violation under the circumstances. Any information reported by the media regarding which officers managed the mounted patrol unit does not constitute a MGDPA violation, because an employee's name, job title, and job description are public data accessible by the media. *See* Minn. Stat. § 13.43, subd. 2(a)(1)-(2).

The December 5, 1997 newspaper article reported the existence and status of an investigation into the mounted patrol's financial management. The MGDPA allows the public access to such information. *See id.*§ 13.43, subd. 2(a)(4). That "specific reasons" and "data documenting the basis" for an investigation cannot be released to the public until after a final disposition, does not mean the public may be informed of *no reasons at all* for the investigation. *See* Minn. Stat. § 13.43, subd. 2(a)(5). Olson's remarks quoted in the article did not reach the specific details and data underlying the investigation. *See* Mavity Aff., Ex. K. Olson limited his comments to generalities. He did not reveal details. The article quoted Olson as saying, "[a]s we were getting towards the end of this internal investigation . . . we became concerned in a couple of areas where the accountability for some money [was] not satisfactory. This [had] to do with

fund-raising and receiving donations, that kind of thing." *Id.* The article also reported that Olson declined to disclose how much money was at issue. *Id.*

Another newspaper article[8] also confirmed the existence and status of an investigation into the mounted patrol's finances, but did not release the specific details on which it was based. Neither newspaper article reflects that the City released "specific reasons" and "data documenting the basis" for the investigation. No reasonable reading of the articles could indicate that the City improperly released "personnel data" on Hoffman. *Cf. Navarre v. South Washington Co. Schs.*, 633 N.W.2d 40, 50-51 (Minn. App. 2001) (finding that a publication did not identify plaintiff and any implicit reference to her was incidental to the subject of the publication). The City simply provided the inquiring media with information regarding the existence and status of an investigation into the mounted patrol.

A March 3, 1998, newspaper article reported Hoffman's termination. Under the MGDPA, "upon completion of an investigation of a complaint or charge against a public official, or if a public official resigns or is terminated from employment while the complaint or charge is pending, all data relating to the complaint or charge are public . . . ." Minn. Stat. § 13.43, subd. 2(e). The relevant statute defines "public official" as "executive or administrative heads of departments, bureaus, divisions, or institutions." Minn. Stat. § 13.43, subd. 2(e)(3). Because Hoffman was the Lieutenant in charge of the mounted patrol unit, she was properly considered the head of a division. Thus, any data relating to the investigation and charges against her was

---

[8] Ka Vang, *Minneapolis Mounted Patrol Investigated*, Pioneer Press, December 5, 1997, at 3D.

public data after the completion of the investigation and her termination at the beginning of March, 1998. Accordingly, the City's reports to the media of Hoffman's termination were not in violation of the MGDPA.

## IV. CONCLUSION

Based upon the foregoing, and all of the files, records and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment [Doc. No. 45] is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

BY THE COURT:

ANN D. MONTGOMERY
UNITED STATES DISTRICT JUDGE

Dated: December 11, 2001

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information <u>must</u> be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*

Forms/8thcircuitprehearingconf.wpd